UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARGARET J. FOLEY,

                Plaintiff,

        v.

UNITED STATES OF AMERICA,

                Defendants.
_____

<u>DECISION AND ORDER</u>

15-CV-6241L

## PRELIMINARY STATEMENT

On April 24, 2015, plaintiff Margaret J. Foley ("Plaintiff" or "Foley"), as the

Administratrix of the Estate of John J. Foley, III ("decedent"), commenced this medical

malpractice action *pro se*[1] against the United States of America (the "Government") and the

Department of Veterans Affairs pursuant to the Federal Torts Claims Act ("FTCA"), 28 U.S.C.

§ 2671, *et seq.*, and 28 U.S.C. § 1346(b). (Dkt. # 1). Foley filed an Amended Complaint on

June 7, 2016, against the Government, solely on behalf of herself. (Dkt. # 25). She alleges

claims for negligence, medical malpractice, wrongful death, and vicarious liability and seeks

damages for her expenses and pain and suffering caused by her husband's death. (*Id.*).

Now pending are three motions. The first is the Government's motion for summary

judgment. (Dkt # 37). In response, Foley cross-moved to amend her Amended Complaint. (Dkt

# 39). She also submitted an additional letter from her expert witness, which the Government

---

[1] Initially, this Court required Foley, as Administratrix, to obtain counsel. (Dkt. # 3). Based on the authority in *Guest v. Hansen*, 603 F.3d 15, 16 (2d Cir. 2010), this Court subsequently allowed Foley to proceed *pro se*. (Dkt. # 20). Still, the Court "caution[ed]" and "urge[d]" her to obtain counsel (*id.* at 2), which she did not do.

has moved to strike.  (Dkt # 49).  All three motions are opposed.  For the following reasons, the Government's motions for summary judgment and to strike are granted, and Foley's cross-motion to amend is denied.  Thus, Foley's Amended Complaint is dismissed with prejudice.

## FACTUAL BACKGROUND[2]

A.  Overview

Decedent died on February 4, 2011, at the age of 64, while a patient at Frederick Ferris Thompson Hospital ("FF Thompson") in Canandaigua, New York.  (Dkt. # 37-4 at 4).[3]  The immediate cause of death was septic shock due to toxic megacolon and [Clostridium difficile] colitis.  (*Id.*).  Another significant condition contributing to decedent's death, but not related to septic shock, was his chronic obstructive pulmonary disease ("COPD").  (*Id.*).  The thrust of Foley's allegations is that Megan Walters, M.D. ("Dr. Walters"),[4] a doctor employed at all relevant times by the Veterans Administration Medical Center (the "VA") in Canandaigua, New York, committed malpractice by failing to timely recognize and treat decedent's alleged symptoms of Clostridium difficile infection.  (Dkt. ## 25 at ¶ 32; 40 at 15).  However, as will be demonstrated below, Foley's claimed malpractice is a bit of a moving target, on account of the changing, inconsistent, and speculative opinions of her so-called expert.

---

[2] Foley's opposition to summary judgment did not comply with this District's Local Rules. *See* W.D.N.Y. LOCAL R. CIV. P. 56(a)(2).  Yet Foley did submit her own version of events with exhibits.  In light of the "special solicitude" afforded to *pro se* litigants, *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), the Court will not reject Foley's opposition papers, nor admit the Government's statement of facts, solely because of Foley's noncompliance. Instead, the Court will "conduct an assiduous review of the record" to determine whether a genuine dispute exists with regard to any material fact.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (quoting *Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000).

[3] The page numbers referenced in citations to the docket correspond to the page numbers generated by CM/ECF.

[4] Dr. Walters is board certified in Internal Medicine and Geriatric Medicine.  (Dkt. # 37-3 at ¶ 17).

B.  Clostridium Difficile[5]

Clostridium difficile ("C. diff.") is a disease causing bacterium found in human feces. STEDMANS MEDICAL DICTIONARY 182620, Westlaw (database updated November 2014).  C. diff. infection is a common cause of colitis—inflammation of the colon—and diarrhea, *see id.*, and can be caused by the use of antibiotics, advanced age, and hospitalization, (Dkt. # 40-3 at 5). "The most common clinical presentation of [C. diff. infection] is diarrhea associated with a history of antibiotic use."  (*Id.* at 6).

C.  Decedent's Treatment at the VA from December 2, 2010, to December 7, 2010

Decedent was admitted to the VA from Highland Hospital, in nearby Rochester, New York, on December 2, 2010, for rehabilitation related to a recent hip fracture.  (Dkt. # 37-4 at 25).  None of decedent's medical records from Highland Hospital has been submitted.  Upon admission to the VA, Dr. Walters indicated that decedent was "well known to staff and this provider from prior rehab stays[.]"  (*Id.*).  Dr. Walters also noted decedent's extensive medical history, which included, among several other things, COPD, ongoing tobacco use, and history of traumatic brain injury, leading to cognitive disorder not otherwise specified.  (*Id.*).  At that time, decedent was "[m]oving bowels about every other day."  (*Id.* at 27).

D.  Decedent's Treatment at FF Thompson from December 7, 2010, to December 21, 2010

On December 7, 2010, decedent was transferred to the emergency department at FF Thompson because he became confused with hallucinations and more overtly short of breath. (Dkt. # 37-4 at 33).  Upon admission, he was started on antibiotics "for suspicion of healthcare

---

[5] Neither party offers medical testimony defining Clostridium difficile infection or colitis.  Instead, they offer various internet articles, only one of which both parties submitted.  (Dkt. ## 37-4 at 6-23; 40-3 at 4-21).  The Court will use that article, as well as Stedmans Medical Dictionary, to explain Clostridium difficile infection and colitis.

facility acquired pneumonia." (*Id.*). This treatment improved decedent's condition, and he was discharged on December 21, 2010. (*Id.* at 36-37).

  E. <u>Decedent's Treatment at the VA from December 21, 2010, to January 27, 2011</u>

Decedent returned to the VA on December 21, 2010. (*Id.* at 40). On December 27, 2010, decedent reported that he had been in "pain all weekend, and ha[d] 'withdrawal symptoms' of loose stools and shakiness." (*Id.* at 42). Dr. Walters made notes addressing treatment for decedent's pain and shakiness, but not for decedent's loose stools. (*Id.*).

Dr. Walters saw decedent again on January 5, 2011. (Dkt. # 40-2 at 4). At that time, decedent's main concerns were "exacerbation of chronic pain, shakiness, and [shortness of breath]," and he also felt that he was "in withdrawal from pain med[ications] as he has had some loose stools." (*Id.*). Dr. Walters noted that he "likely would not be experiencing withdrawal" symptoms. (*Id.*). This is the last medical note from the VA regarding decedent experiencing diarrhea. In fact, on January 15, 2011, Nurse Beverly Davis noted that decedent continued to complain of constipation. (Dkt. # 37-4 at 53).

The vast majority of decedent's remaining medical records from the VA relate to his respiratory issues, chronic pain, and lower extremity edema,[6] all of which Dr. Walters and nursing staff continued to monitor and note in decedent's medical file. (*See*, *e.g.*, Dkt. # 40-2 at 7-11). Dr. Walters treated decedent's respiratory issues as bronchitis with inhalers and antibiotics, and noted that despite his breathing issues, he continued to smoke cigarettes and wheel himself around the VA in his wheelchair "without getting too [short of breath]." (*Id.* at 8). On January 14, 2011, Dr. Walters made a note that it was "[u]nclear at this time whether [decedent] will be able to be managed [at the VA]," but it is not clear from a review of that note

---

[6] Edema is an accumulation of fluid in a body part. Stedmans Medical Dictionary 279130, Westlaw (database updated November 2014).

why she said that. (*Id.*). On January 10, 2011, she also noted that she should "[c]onsider palliative care consult – [decedent] has twice now expressed to me (today and last week) that he is thinking of his own mortality after most recent hospitalization." (*Id.* at 11).

On January 27, 2011, Dr. Walters examined decedent for increased difficulty in breathing and increased confusion, and she decided to transfer decedent to FF Thompson's emergency department for "eval[ulation] of hypoxia and resp[iratory] distress, [and return of] pneumonia." (Dkt. # 40-2 at 40-41).

F. Decedent's Treatment at FF Thompson from January 27, 2011, to February 4, 2011

Decedent's chief complaint on admission to FF Thompson was respiratory failure. (Dkt. # 37-4 at 59). Within the first two days of decedent's admission, at least two doctors examined him—Dr. David E. Baum and Dr. Henry Castro Maglente. Dr. Baum indicated that decedent had experienced "COPD exacerbation requiring ventiliatory assistance," and noted "bacterial bronchitis." (*Id.* at 64). Dr. Maglente noted that decedent exhibited "some faint wheezing," and had "normoactive bowel sounds." (*Id.* at 60). Dr. Maglente's "Assessment and Plan" for decedent focused on treating decedent's respiratory issues, namely COPD and pneumonia, and decedent's chronic pain issues. (*Id.* at 60-62).

On February 1, 2011, a third doctor, Dr. Ravi Agarwala, noted improvement in decedent's breathing issues, but also that he had experienced "3 watery [bowel movements on January 31, 2011]," (*id.* at 68), which Dr. Agarwala attributed to "nosocomial diarrhea secondary to C difficile," (*id.* at 80).[7] Decedent experienced further loose watery bowel movements on

---

[7] Nosocomial is "[r]elating to a hospital," and "[d]enot[es] a new disorder (not the patient's original condition) associated with being treated in a hospital, such as a hospital-acquired infection." STEDMANS MEDICAL DICTIONARY 610930, Westlaw (database updated November 2014).

February 1, February 2, and February 3, 2011, and began to lose his appetite due to abdominal cramps and abdominal pain. (*Id.* at 72, 74, 76, 80, 82).

On February 3, 2011, Dr. Thomas Wormer opined that "there [was] certainly concern for toxic megacolon," which was likely "all related to [decedent's] C. diff. colitis," and recommended that decedent undergo a colonoscopic decompression. (Dkt. # 40-3 at 33). Dr. Raymond Thomas performed the colonoscopy on February 3, 2011. (Dkt. # 40-2 at 44). Dr. Thomas indicated that decedent had "[s]evere C. diff. infection and probable toxic megacolon. . . . He also [was] in respiratory distress as a result of his C. diff infection and respiratory status." (*Id.*). Dr. Thomas opined that decedent had "[s]evere pseudomembranous colitis with decompression of the dilated colon." (*Id.*).[8] Afterwards, decedent's condition continued to worsen and he developed "overt septic shock with hypotension." (Dkt. # 37-4 at 91-92).

## DISCUSSION

## I. **The Government's Motion for Summary Judgment**

### a. Legal Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure requires summary judgment if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, a burden met by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an

---

[8] Pseudomembranous colitis occurs most commonly because of antibiotic use, and is caused by a toxin made by C. diff. STEDMANS MEDICAL DICTIONARY 294050, Westlaw (database updated November 2014).

element essential to that party's case, and on which that party will bear the burden of proof at trail." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 323 (1986).

If the moving party meets its burden, the opposing party survives summary judgment only by producing admissible evidence that "set[s] forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The court must also view all ambiguities and inferences that may be reasonably drawn from the facts in a light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255.

When the party opposing summary judgment is a *pro se* litigant, the court should liberally construe his or her pleadings, so "to raise the strongest arguments that they suggest." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (citation omitted). However, "proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment." *Gittens v. Garlocks Sealing Techs.*, 19 F. Supp. 2d 104, 110 (W.D.N.Y. 1998).

b. Admissibility of Dr. Mallory's Expert Report

The Government's principal argument on summary judgment is that the expert report of G. Edward Mallory, D.O. ("Dr. Mallory"), Foley's expert witness, is inadmissible under Rule 702 of the Federal Rules of Evidence because it is unreliable and irrelevant, and Dr. Mallory is unqualified to opine as an expert witness. (Dkt. # 37-1 at 2).

At the summary judgment stage, a court can "decide questions regarding the admissibility of evidence, including expert opinion evidence[.]" *Bah v. Nordson Corp.*, No. 00-cv-9060, 2005

WL 1813023, *6 (S.D.N.Y. Aug. 1, 2005) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.

1997)).  This is so because "[o]n a summary judgment motion, a district court properly considers

only evidence that would be admissible at trial."  *Nora Beverages, Inc. v. Perrier Grp. of

America, Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "This is true even if the exclusion of expert

testimony would be outcome-determinative."  *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380

F. Supp. 2d 334, 351 (S.D.N.Y. 2005).

Thus, the Court will first determine the admissibility of Dr. Mallory's Expert Report prior

to determining the merits of the Government's summary judgment motion.  *See*, *e.g.*, *Bah*, 2005

WL 1813023 at *6 ("the [c]ourt will first address the admissibility of [expert's] opinion evidence

before ruling on [defendant's] summary judgment motions"); *see also Cacciola v. Selco Balers,

Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) ("Evidence contained in an expert's report

therefore must be evaluated under [Rule] 702 before it is considered in a ruling on the merits of a

summary judgment motion.").

    i.    <u>Legal Standard</u>

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

FED. R. EVID. 702.  In performing its "gatekeeping role," the district court must ensure that a

witness is qualified as an expert, *see id.*, and "that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand," *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S.

579, 597 (1993).  "[T]he proponent of expert testimony has the burden of establishing by a

preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Furthermore, "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]" *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962).

ii.    Qualifications of Dr. Mallory

Whether a witness is qualified to testify as an expert is a "threshold question," *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005), which is liberally construed in this Circuit, *see United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985). Courts can look to the "totality of the expert's qualifications" to determine if the expert is "qualified to testify through knowledge, skill, experience, training, or education." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007). An expert "need not be a specialist in the exact area of medicine implicated by the plaintiff's injury, [but] he must have relevant experience and qualifications such that whatever opinion he will ultimately express would not be speculative." *Loyd v. United States*, No. 08-cv-9016, 2011 WL 1327043, *5 (S.D.N.Y. Mar. 31, 2011) (citations and quotations omitted).

Dr. Mallory's curriculum vitae demonstrates that he has been board certified by the American Osteopathic Board of Emergency Medicine since 1993. (Dkt. # 37-4 at 100). He is the owner and president of emergencyexpertforyou.com, which appears to be an "expert for hire" entity and which he established in 2014, and has been an attending physician in emergency medicine at Wuesthoff Hospital in Rockledge, Florida, since 2009. (*Id.* at 99). Dr. Mallory received his Osteopathic Medical Degree from Kirksville College of Osteopathic Medicine in 1998, and he completed a residency in emergency medicine from Delaware Valley Medical Center—now called Aria Health Buck's County Campus—in 1992. (*Id.* at 100). Since then, he

has worked at various Florida hospitals as an attending physician in emergency medicine. (*See generally id.* at 99-100). In response to the Government's request for Dr. Mallory's publications and cases in which he has been deposed, Dr. Mallory indicated that, within the last four years, he has not "published anything," and he has only "participated in 1 case where [he] gave a deposition," which involved different issues that the current case. (*Id.* at 102).

Based on Foley's allegations in the Amended Complaint, Dr. Mallory's ability to testify on the signs and symptoms of C. diff. and the appropriate standard practice for diagnosing and treating C. diff. in patients is vital to his function in this case. Significantly absent from the record, though, is any explanation, let alone proof, detailing how Dr. Mallory's knowledge, skill, experience, training, or education relates in any way to C. diff. There is also no evidence regarding how physicians whose alleged expertise is emergency medicine are qualified to opine on malpractice relating to C. diff., and the Court is unable to infer that based solely on Dr. Mallory's curriculum vitae. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) ("merely possessing a medical degree is not sufficient to permit a physician to testify [as an expert] concerning any medical-related issue"). Without any such testimony, this Court cannot conclude that Dr. Mallory is qualified to give expert testimony in this case. *See*, *e.g.*, *Clayton v. Katz*, No. 10-cv-575, 2015 WL 1500248, *9 (S.D.N.Y. Mar. 31, 2015) ("there is no evidence in the record that [expert] has relevant clinical experience, laboratory research or any background or experience in the field which would qualify him to give expert testimony on the subject").

### iii.   Reliability of the Expert Report

Assuming, *arguendo*, that Dr. Mallory was qualified as an expert, the Expert Report would be inadmissible under Rule 702 because it is unreliable.

"In determining whether an expert's opinion should be excluded as unreliable, 'the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Houser v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 470, 475 (W.D.N.Y. 2017) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nimely*, 414 F.3d at 396 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

Several facts are important to Dr. Mallory's opinions in his Expert Report. His first opinion is that Dr. Walters should have transferred decedent to FF Thompson on January 18, 2011—as opposed to January 27, 2011—because decedent's "oxygen saturations went down to 81% and [decedent was] telling Dr. Walters he was short of breath." (Dkt. # 37-4 at 96, ¶ 4). He bases that opinion on Nurse Beverly Davis's note that decedent's oxygen saturation levels were low, and that oxygen was given to decedent that day "with little effect." (*Id.* at 94, ¶ 3).

While decedent's medical records demonstrate that his oxygen saturations dropped on January 18, 2011, Dr. Mallory has completely failed to explain the significance of that drop or why those specific oxygen saturation levels necessitated a transfer to FF Thompson. This is particularly troubling because it is not apparent that decedent's oxygen saturations remained at those levels for the remainder of his stay at the VA, and because staff at the VA continued to

monitor and treat decedent for his respiratory issues. (*See*, *e.g.*, Dkt. # 40-2 at 38) (nursing note from January 18, 2011, indicating that Nurse Beverly continued to encourage decedent to use oxygen, that the RN was aware of decedent's condition, and that staff would continue to monitor decedent and report). In addition, Dr. Mallory has failed to make any connection between decedent's oxygen saturation levels and the alleged lack of care by Dr. Walters. Without more, then, this opinion is entirely conclusory and merely "the *ipse dixit* of the expert." *See Nimely*, 414 F.3d at 396.

Dr. Mallory's second opinion is that "when [decedent] was admitted to [FF Thompson] he already had [C. diff.] infection." (Dkt. # 37-4 at 96, ¶ 4). In his opinion, this is based on decedent's "recurring episodes of loose stools" at the VA after December 27, 2010, Plaintiff's testimony that a patient "in the next room [to decedent at the VA] had been in isolation for [C. diff.] enteritis," and that by January 5, 2011, decedent "had had approximately 9 days of diarrhea." (*Id.* at 94, ¶ 3).

Amazingly, the record supports none of those "facts." For this reason alone, Dr. Mallory's opinion should be rejected. First, nothing in the record—beyond Plaintiff's own statements—demonstrates that a patient in close proximity to decedent at the VA had diarrhea associated with C. diff. There is no evidence from the VA that this was so. Dr. Mallory appears to rely on hearsay from Plaintiff, who has not set forth an admissible evidentiary basis for that opinion, and, of course, Plaintiff is not qualified to give opinions about the maladies or illnesses of other patients. Plaintiff had an opportunity to find support for this speculative allegation during discovery, yet failed to do so. Without admissible medical testimony to support this allegation, it is an insufficient basis for Dr. Mallory's opinion.

Second, Dr. Mallory's statements regarding decedent's "recurring episodes" of loose stools and that decedent had nine days of diarrhea at the VA are wholly contradicted by the record. Decedent's VA medical records indicate that he experienced diarrhea on two days, December 27, 2010, and January 5, 2011, not every day during that period. In addition, Plaintiff testified at her deposition that decedent "complained of having loose stools *two* times during his admission at the VA[.]" (Dkt # 45-1 at 3) (emphasis supplied). That confirms what is contained in the medical record. It is also in accord with Dr. Walters's deposition testimony, in which she states that decedent had "an absence of any sustained report of diarrhea or loose stools." (Dkt. # 37-4 at 108). Furthermore, there is no note in the VA medical records that decedent had diarrhea at *any* point from January 5, 2011, through January 27, 2011, the date decedent left the VA, or that *any* staff at the VA suspected that decedent might have had C. diff. infection. In fact, there are notes that decedent experienced constipation after January 5. (Dkt. # 37-4 at 53).

The Court also finds it significant that no medical staff at FF Thompson recorded any signs or symptoms of C. diff. infection until four days *after* decedent was admitted on January 27, 2011. Beyond the fact that decedent was admitted to FF Thompson for respiratory issues, at least two medical doctors—Drs. Baum and Maglente—examined decedent within his first two days there and neither made a note about decedent having diarrhea or C. diff. infection. In fact, the first note about decedent experiencing loose watery bowel movements appeared on January 31, 2011. (Dkt. # 37-4 at 70). Even decedent's discharge summary after his death, authored by Dr. Agarwala from FF Thompson, indicated that decedent "was initially admitted to the intensive care unit . . . his breathing improved . . . [and he] was progressively weaning off his oxygen and was doing better from a respiratory standpoint when he *developed* diarrhea which tested positive for [C. diff.]. Diarrhea persisted for approximately 48 hours. *At that time*, patient *began*

*complaining* of some crampy abdominal pain."  (Dkt. 37-4 at 91) (emphasis supplied).  This

suggests that decedent developed his condition not at the VA.

Therefore, Dr. Mallory's opinion that decedent "already had" C. diff. infection upon his

admission to FF Thompson is based on a grossly inaccurate reading of the record and pure

speculation, which renders his opinion on decedent's C. diff. unreliable.  *See*, *e.g.*, *Houser*, 264

F. Supp. 3d at 477 (finding expert report unreliable under Rule 702 because it was "speculative,

based upon an unsupported and inaccurate interpretation of the record evidence, and posit[ed]

blanket conclusory statements of causation and liability").

Moreover, Dr. Mallory has not attempted to explain his methodology regarding how he

arrived at these opinions.  "An expert opinion requires some explanation as to how the expert

came to his conclusion and what methodologies or evidence substantiate that conclusion."

*Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006).  An expert with experience still must

"base[] [his] opinion on sufficient facts or data, and *must explain* how that experience le[d] to the

conclusion reached, why that experience is a sufficient basis for the opinion, and how that

experience is reliably applied to the facts[.]"  *Smith v. Target Corp.*, No. 10-cv-1457, 2012 WL

5876599, *10 (N.D.N.Y. Nov. 20, 2012) (emphasis supplied) (quoting *Bah*, 2005 WL 1813023

at *9).  This is so "because the trial court's gatekeeping function requires more than simply

taking the expert's word for it."  *Smith*, 2012 WL 5876599 at *10 (quotations omitted).  First, it

is clear that Plaintiff has failed to establish that Dr. Mallory did have experience diagnosing and

treating C. diff.  And, as noted above, Dr. Mallory's opinions are not based on an accurate

reading of the medical records.  In any event, the Expert Report is simply devoid of any

explanation regarding how Dr. Mallory's professional experience led him to conclude that Dr.

Walters should have transferred decedent to FF Thompson on January 18, 2011, rather than nine

days later, and that decedent "already had" C. diff. upon his admission to FF Thomson.  In addition, as mentioned, none of the medical staff at FF Thompson noted that condition upon decedent's admission.  Nor has Dr. Mallory explained why his professional experience is a sufficient basis for those opinions, or how he reliably applied his professional experience to the facts.  Thus, his opinions are completely unreliable.

Dr. Mallory concludes that "[b]ased on [his] review of [decedent's] records and the foregoing analysis . . . Dr. Walters was negligent in his [sic] care and treatment of and [sic] it is [Dr. Mallory's] further opinion that his [sic] negligence as outlined above was a proximate cause of her [sic] worsening pneumonia and hypoxia."  (Dkt. # 37-4 at 97, ¶ 5).  As discussed above, Dr. Mallory bases this conclusion on either conclusory opinions or an inaccurate reading of the medical records.  As a result, "there is simply too great an analytical gap" between the facts Dr. Mallory relies upon and his conclusion for that opinion to be reliable.  *See Nimely*, 414 F.3d at 396 (citation omitted).

iv.   Relevance of the Expert Report

"Rule 401 [of the Federal Rules of Evidence] provides the standard for relevance of an expert's opinion."  *Bosco v. United States*, No. 14-cv-3525, 2016 WL 5376205, *11 (S.D.N.Y. Sept. 26, 2016).  Thus, "an expert's opinion is relevant if 'it has any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence.'"  *Id.* (quoting FED. R. EVID. 401).

Here, Dr. Mallory concludes that Dr. Walters's alleged negligence "was a proximate cause of [decedent's] worsening pneumonia and hypoxia."  (Dkt. # 37-4 at 97, ¶ 5).  Yet that conclusion does not match up with Plaintiff's theory of causation or liability.  Plaintiff alleges that Dr. Walters committed malpractice by failing to timely diagnose and treat C. diff. in

decedent. (Dkt. # 25 at ¶ 32). Plaintiff does *not* allege that either worsening pneumonia or hypoxia was the primary cause of decedent's death. In addition, Plaintiff nowhere attributes worsening pneumonia or hypoxia to Dr. Walters's alleged malpractice. Finally, and perhaps most significantly, Dr. Mallory does not explain how decedent's worsening pneumonia and hypoxia led to his death by septic shock due to toxic megacolon and C. diff. colitis. Thus, this Court cannot say that Dr. Mallory's opinion as to causation and liability has a tendency to make Dr. Walters's alleged failure to treat decedent's C. diff. infection more or less probable. Therefore, in addition to being unqualified as an expert and rendering an opinion that is unreliable, Dr. Mallory's opinion is also irrelevant to the facts of this case.

Based on the foregoing analysis, the Expert Report is completely deficient and represents mere speculation or conjecture. Thus, it is inadmissible pursuant to Rule 702 and this Court will not consider it on summary judgment. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (stating that "an expert's opinions that are without factual basis and are based on speculation or conjecture are . . . inappropriate material for consideration on a motion for summary judgment," as are "conclusory opinions"); *see, e.g.*, *Houser*, 264 F. Supp. 3d at 478 (finding expert's report unreliable and "as such, it cannot be considered admissible evidence in opposition to [d]efendant's motion for summary judgment"); *Berk*, 380 F. Supp. 2d at 356 (excluding plaintiff's expert testimony as inadmissible under Rule 702, and determining defendants' summary judgment motion based on "the admissible evidence").

c. <u>Foley Cannot Prevail on Her Medical Malpractice Claim</u>[9]

To prevail on a medical malpractice claim in New York, a plaintiff must demonstrate "(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused plaintiff's injuries." *Arkin v. Gittleson*, 32 F.3d 658, 664 (2d Cir. 1994). To show a breach, "the plaintiff ordinarily must show what the accepted standards of practice were and that the defendant deviated from those standards or failed to apply whatever superior knowledge he had for the plaintiff's benefit." *Sitts v. United States*, 811 F.2d 736, 739 (2d Cir. 1987). In assessing causation, the Court "must determine whether a trier of fact could conclude that an alleged deviation from standards of practice was a substantial factor in producing the injury." *Hersko v. United States*, No. 13-cv-3255, 2015 WL 6437561, *13 (S.D.N.Y. Oct. 20, 2015) (quotations omitted). A plaintiff must present "expert testimony in support of the allegations to establish a prima facie case of malpractice," unless "the alleged act of malpractice falls within the competence of a lay jury to evaluate[.]" *Sitts*, 811 F.2d at 739 (citation omitted). "[T]he medical malpractice case in which no expert testimony is required is 'rare.'" *Id.*

Here, whether Dr. Walters failed to timely diagnose decedent with C. diff. infection, and whether the delay in transferring decedent to FF Thompson exacerbated decedent's condition, is not "within the understanding of the ordinary layman." *Sitts*, 811 F.2d at 739-40. Therefore, Foley's medical malpractice claim "must be established by expert testimony." *Id.*

Dr. Mallory's Expert Report is inadmissible. (*See*, *supra*, § I.b). Without admissible expert testimony, Foley cannot demonstrate a prima facie case of medical malpractice. *See*, *e.g.*, *Vale v. United States*, No. 10-cv-4270, 2015 WL 5773729, *4 (E.D.N.Y. Sept. 30, 2015) ("Since

---

[9] The Government's liability under the FTCA is determined based on the law of the state where the injury occurred. *See* 28 U.S.C. § 1346(b); *Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir. 1998). Therefore, Foley's medical malpractice claim "must meet the substantive requirements of New York law." *Bosco*, 2016 WL 5376205 at *8.

[p]laintiff has failed to provide admissible testimony from a qualified expert that demonstrates that [d]efendant deviated from the applicable standard of care and that [d]efendant's deviation was the proximate cause of [p]laintiff's injuries, [d]efendant's motion for summary judgment is granted"), *aff'd*, 673 Fed. Appx. 114 (2d Cir. 2016) (summary order); *see also Berk*, 380 F. Supp. 2d at 356 ("Without the [expert] testimony excluded by the [c]ourt, [plaintiff's] medical malpractice claim cannot survive [d]efendants' summary judgment motion.")

In any event, Dr. Mallory's so-called Expert Report is insufficient as a matter of law to create a genuine issue of fact regarding Foley's malpractice claim. Dr. Mallory does not explain any standard practice for when a physician should test a patient's stool for C. diff. This is problematic in light of Dr. Walters's testimony that, beyond decedent's inconsistent and "intermittent" reporting of loose stools, he did not present with clinical symptoms associated with C. diff. infection. (Dkt. # 37-4 at 106-08). Similarly, Dr. Mallory does not explain the standard of care as to when a physician should transfer a patient to a hospital, as opposed to continuing to treat the patient at a VA medical facility, based on oxygen saturation levels. Therefore, Foley cannot establish that Dr. Walters deviated from any standard practice of care. *See Hegger v. Green*, 646 F.2d 22, 29 (2d Cir. 1981) ("Under New York law, a plaintiff in a medical malpractice action *must* produce medical testimony to establish the proper standard of care.") (emphasis supplied); *see also Zeak v. United States*, No. 11-cv-4253, 2014 WL 5324319, *9 (S.D.N.Y. Oct. 20, 2014) ("Here, unable or unwilling to opine on the appropriate standard of care, [plaintiff's expert witness] was, *a fortiori*, unable or unwilling to opine on whether [doctor] breached this standard of care. . . . Plaintiff cannot overcome this deficiency.").

Moreover, the Expert Report fails to establish a sufficient causal link between Dr. Walters's decisions or actions and decedent's death. In short, Dr. Mallory does not link his

conclusory opinion on causation and liability, i.e., that Dr. Walters's negligence was a proximate cause of decedent's worsening pneumonia and hypoxia, to decedent's injury, i.e., death by septic shock due to toxic megacolon and C. diff. colitis. This crucial and unexplained gap in Dr. Mallory's analysis is fatal to Plaintiff's theory of causation. *See Kennedy v. N.Y. Presbyterian Hosp.*, No. 09-cv-6256, 2011 WL 2847839, *4 (S.D.N.Y. July 6, 2011) ("To defeat [d]efendants' Rule 56 motion, [p]laintiff must—but did not—submit expert medical opinion supporting her theory of causation."); *see also Zeak*, 2014 WL 5324319 at *10-11 (expert failed to testify as to any causal link between defendants' actions and decedent's death, "as would be required for [p]laintiff to set forth a prima facie case for malpractice").

Thus, even assuming that Dr. Mallory's Expert Report was admissible, it would still be insufficient to establish either of the elements of a medical malpractice claim. Therefore, the Government is entitled to judgment as a matter of law on Foley's malpractice claim. As a result, Foley's remaining claims for wrongful death and vicarious liability, which are both premised on Dr. Walters's alleged malpractice, must also be dismissed.

## II. Foley's Cross-Motion to Amend the Amended Complaint

On June 1, 2017, Foley cross-moved to amend her Amended Complaint pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. (Dkt. # 39). In sum, Foley seeks to add allegations regarding Dr. Mallory's opinion that "the worsening condition of [decedent] based on his low oxygen saturations of 81% and 84%, high co2 of 35 and difficulty breathing warranted a transfer to an emergency room on January 18, 2011 and not on January 27, 2011." (Dkt. # 39-1 at ¶ 4). The Government opposes, arguing, among other things, that the proposed amendment is futile based on the inadmissibility of the Expert Report. (Dkt. # 47 at 7-10).

Rule 15(a) directs a court to "freely give leave [to amend a complaint] when justice so requires." FED. R. CIV. P. 15(a)(2); *Forman v. Davis*, 371 U.S. 178, 182 (1962). This is a liberal standard, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC.*, 797 F.3d 160, 190 (2d Cir. 2015), yet the court has discretion to deny such a motion when the amendment would be futile, *see Forman*, 371 U.S. at 182. At the summary judgement stage, the court may deny a proposed amendment as futile if the parties have fully briefed "whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions," and the "evidence in support of the plaintiff's proposed new claim creates no triable issue of fact[.]" *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).

Here, the parties have fully briefed whether the proposed amendment creates a triable issue of fact (*see* Dkt. ## 40 at 10; 47 at 7-10), and have presented relevant evidence in support of their positions. The Court is persuaded that Foley's proposed amendment cannot raise a genuine issue of material fact because of the inadmissibility of the Expert Report. (*See*, *supra*, § I.b). In short, Foley has not demonstrated that Dr. Mallory is qualified as an expert to testify about oxygen saturations, or offer opinion evidence about when certain oxygen saturation levels mandate a transfer to an emergency department. In addition, Dr. Mallory's opinion that Dr. Walters should have transferred decedent to FF Thompson on January 18, 2011, is entirely conclusory, and thus, unreliable. Dr. Mallory does not state that decedent's oxygen saturations remained as low as they were on January 18, 2011, and his opinion fails to take into account the fact that doctors at FF Thompson indicated that decedent's respiratory issues actually *improved* upon admission. (Dkt. # 37-4 at 91) ("[Decedent] was initially admitted to the intensive care unit . . . His breathing improved and he was transferred to the floor. . . . He was progressively weaning off his oxygen and was going better from a respiratory standpoint when he developed

diarrhea").  Finally, his opinion is not relevant, as he does not explain how low oxygen saturation levels had anything to do with decedent's death.  Therefore, Foley's motion to amend is denied.

### III. <u>The Government's Motion to Strike Supplemental Expert Report</u>

The final pending motion is the Government's motion to strike, which concerns a May 27, 2017, letter from Dr. Mallory to Foley, the purpose of which was to "answer[] questions from the US attorney."  (Dkt. # 46 at 16-18) (the "Mallory Letter").  Foley submitted the Mallory Letter in her sur-reply to the Government's motion for summary judgment.[10]

The Government makes several arguments in support of its motion to strike.  First, it argues that the Mallory Letter is inadmissible and cannot be used to oppose summary judgment. (Dkt. # 49-1 at 7-9).  The Government notes that the Mallory Letter is unsigned and unsworn, and, moreover, includes opinions that actually contradict Dr. Mallory's primary Expert Report. In this regard, the Government points out that in the Mallory Letter, Dr. Mallory "revises his ultimate opinion" to state that "both worsening pulmonary infection, and worsening gastrointestinal infection, contributed to [decedent's] death.  Dr. Walters did not recognize, or recognized and ignored the worsening signs and symptoms of both of these, leading to an unacceptable delay in care resulting in the death of [decedent]."  (*Id.* at 6) (quoting Dkt. # 49-3 at 8, ¶ 8).  According to the Government, this contradicts the Expert Report's conclusion that Dr. Walters's alleged failure to treat decedent was only a proximate cause of decedent's worsening pneumonia and hypoxia.  Second, the Government argues that the Mallory Letter violates the Federal Rules governing expert disclosures and should be stricken pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure.  (*Id.* at 9-11).

---

[10] Foley's sur-reply is improper because she filed it without the Court's permission.  *See* W.D.N.Y. LOCAL R. CIV. P. 7(a)(6) ("Absent permission of the Judge hearing the motion, sur-reply papers are not permitted.").  However, the Court, in its discretion, will not reject the sur-reply based on Foley's noncompliance.  *See Tracy*, 623 F.3d at 101.

Foley explains in opposition that "the statements provided by Dr. Mallory [in the Mallory Letter] were to further explain on what he had read in the [VA's] progress notes. In order to clarify his position and respond to the questions raised by [the Government], Dr. Mallory provided further detail due to the objection of his expertise by the Defendant." (Dkt. # 51 at 1). She also claims that Dr. Mallory did not sign the Mallory Letter under oath because of a fee dispute with her. (*Id.*).

"As a general matter . . . unsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment." *Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005). Therefore, "[t]he submission of unsworn letters is an 'inappropriate response' to a summary judgment motion, and factual assertions made in such letters are 'properly disregarded by the court.'" *Brazier v. Hasbro, Inc.*, No. 99-cv-11258, 2004 WL 1497607, *2 (S.D.N.Y. July 6, 2004) (quoting *United States v. All Right, Title & Interest in Real Prop. & Appurtenances*, 77 F.3d 648, 657-58 (2d Cir. 1996)); *accord Berk*, 380 F. Supp. 2d at 352-53 ("Courts in [the Second] Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of [Rule 56], and cannot be used to defeat a summary judgment motion without additional affidavit support.").

Foley, aware that the Mallory Letter is neither signed nor sworn to, states, "the letter can be signed under oath however Dr. Mallory is requesting more payment . . . and [she] does not feel that any more payment should be made." (Dkt. # 51 at 1). It is Foley's prerogative whether she wants to pay Dr. Mallory more money to act as her hired expert in this case. However, based on the principles stated above, the unsigned and unsworn Mallory Letter on its face is an "insufficient basis for opposing" the Government's summary judgment motion. *See Capobianco*, 422 F.3d at 55.

Assuming, *arguendo*, that the Mallory Letter was admissible, the Court would also find that it violates the Federal Rules governing expert disclosures. Rule 26(a)(2)(B) requires an initial expert report to contain, among other things, "a complete statement of *all* opinions the witness will express and the basis and reasons for them." FED. R. CIV. P. 26(a)(2)(B)(i) (emphasis supplied). "It should be assumed that at the time an expert issues his report, that report reflects his full knowledge and complete opinions on the issues for which his opinion has been sought." *Sandata Techs., Inc. v. Infocrossing, Inc.*, Nos. 05-cv-9546, 06-cv-1896, 2007 WL 4157163, *4 (S.D.N.Y. Nov. 16, 2007).

Dr. Mallory opines in the Expert Report that Dr. Walters should have transferred decedent to FF Thompson on January 18, 2011, rather than January 27, 2011, and that decedent contracted C. diff. infection prior to his admission to FF Thompson on January 27, 2011. (Dkt. # 37-4 at 94-97). He concludes that Dr. Walters's negligence was a proximate cause of decedent's worsening pneumonia and hypoxia, without opining that those conditions caused decedent's death. (*Id.*). Yet the Mallory Letter contains a *different* conclusion on causation and liability:

> The breach of the standard of care by Dr. Walters was the primary reason [decedent] passed away. Both worsening pulmonary infection, and worsening gastrointestinal infection contributed to his death. Dr. Walters did not recognize, or recognized and ignored the worsening signs and symptoms of both of these, leading to an unacceptable delay in care resulting in the death of [decedent].

(Dkt. # 49-3 at 8, ¶ 8). Moreover, the Mallory Letter contains a previously undisclosed standard of care. Specifically, Dr. Mallory opines that Dr. Walters "violated the standard of care because she failed to obtain a stool specimen for testing and failed to start [decedent] on antibiotics on December 27, or soon after." (Dkt. # 49-3 at 7, ¶ 2). According to Dr. Mallory, "any physician that practices 'mainstream,' 'up to date' medicine would order a panel of 'diarrhea tests' which

include detection of C. diff. toxin," knowing that decedent "was currently taking or had recently completed antibiotics . . . [and] started having diarrhea on December 27." (*Id.*).

The Mallory Letter also contains new facts in support of Dr. Mallory's previous opinion that decedent "already had" C. diff. infection upon arrival to FF Thompson. Dr. Mallory claims that decedent had "persistence of diarrhea from December 27 *until he was admitted* to F.F. Thompson hospital on January 31." (Dkt. # 49-3 at 8, ¶ 6(c)) (emphasis supplied). He also claims that decedent "had diarrhea on the day he was admitted to [FF] Thompson hospital on January 27." (*Id.* at ¶ 7). Essentially, Dr. Mallory's new statement is that decedent had persistent diarrhea for a month at the VA. Yet curiously, he cites no medical evidence to support that, and based on this Court's review of decedent's medical records, there is absolutely no evidentiary basis for that statement. In addition, that statement is materially different from Dr. Mallory's prior statement that decedent had nine days of diarrhea, which is also not based on an accurate reading of the medical evidence.

The fact that the Mallory Letter contains this new testimony means that the Expert Report did not contain "a complete statement of *all* [Dr. Mallory's] opinions . . . and the basis and reasons for them." *See* FED. R. CIV. P. 26(a)(2)(B)(i); *see*, *e.g.*, *Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 301 F.R.D. 31, 40 (S.D.N.Y. 2014) ("Because the [untimely expert report] goes beyond [expert's] timely produced expert disclosures, [plaintiff] has violated [Rule] 26(a)(2) by failing to timely disclose a written 'report [that] contain[s] a complete statement of all opinions the witness will express.'") (citing FED. R. CIV. P. 26(a)(2)(B)(i)).[11] In addition, as a

---

[11] Moreover, the Mallory Letter is not a proper supplemental expert disclosure pursuant to Rule 26(e)(1)(A) of the Federal Rules of Civil Procedure. A party can only supplement under that rule "if the expert subsequently learns of information *that was previously unknown or unavailable*, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete[.]" *Sandata Techs., Inc.*, 2007 WL 4157163 at *4 (emphasis supplied); *accord Lidle v. Cirrus Design Corp.*, No. 08-cv-1253, 2009 WL 4907201, *5 (S.D.N.Y. Dec. 18, 2009) ("Rule 26(e) is not . . . a vehicle to permit a party to serve a deficient opening report and then remedy the

general matter, "courts should not permit untimely disclosure of new opinions to fill gaps in expert proof, particularly where those gaps are revealed through the opposing party's summary judgment motion." *Chart v. Town of Parma*, No. 10-cv-6179, 2014 WL 4923166, *25 (W.D.N.Y. Sept. 30, 2014); *accord Morritt v. Stryker Corp.*, No. 07-cv-2319, 2011 WL 3876960, *6 (E.D.N.Y. Sept. 1, 2011) (finding that expert's declaration "clear[ly]" violated Rule 26 where it was "designed to fill a significant and logical gap in [the] expert report," and it was submitted for the first time "only after defendants raised [the] deficiency in [defendants' summary judgment] motion"). Here, the Court has no trouble concluding that the Mallory Letter was an attempt to fill obvious gaps in the Expert Report, which the Government highlighted in its summary judgment motion.

Rule 37 states that "[i]f a party fails to provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). In applying Rule 37, a court should consider: "(1) the proponent's explanation for failing to provide the subject evidence; (2) the importance of such evidence to the proponent's case; (3) the opponent's time needed to prepare to meet the evidence; and (4) the possibility of obtaining a continuance to permit the opponent to meet the evidence." *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 229 (W.D.N.Y. 2011) (citing *Outley v. City of New York*, 837 F.2d 587, 590 (2d Cir. 1988)). "The party that failed to comply with its discovery obligations bears the burden of proving that its failure was both substantially justified and harmless." *Chart*, 2014 WL 4923166 at *25.

---

deficiency through the expedient of a 'supplemental' report."). Here, there is no claim that the Mallory Letter is based on new information that would put the disclosure within the ambit of Rule 26(e).

Initially, the Court finds that Foley's late submission of the Mallory Letter is not substantially justified because it was an attempt to "fill a significant and logical gap" in the Expert Report, the need for which Foley only realized after the Government fully briefed its summary judgment motion. *Chart*, 2014 WL 4923166 at *26. Nor is Foley's submission of the Mallory Letter harmless, given that it contains new facts and testimony regarding causation and liability.

Furthermore, Foley does not attempt to explain why the information in the Mallory Letter was not included in the Expert Report. This factor, then, favors preclusion. *See*, *e.g.*, *Prendergast v. Hobart Corp.*, No.04-cv-5134, 2010 WL 3199699, *5 (E.D.N.Y. Aug. 12, 2010) ("Plaintiff had ample time for expert discovery in this case and has provided no justification for her failure to disclose the opinions in [the expert's] affidavit with his expert report or during his deposition. The opinions set forth for the first time in [the expert's] affidavit are therefore properly stricken on this ground alone.").

Second, even if the information contained in the Mallory Letter is important to Foley's case, that would "only serve[] to underscore the inexcusable quality of its delayed submission." *Advanced Analytics, Inc.*, 301 F.R.D. at 41. In addition, striking a defective supplemental expert submission does not necessarily preclude an expert from testifying about his or her original expert report, assuming that the expert report was proper and reliable. *See*, *e.g.*, *Florentine v. Cates*, No. 06-cv-1155, 2008 WL 11355383, *3 (N.D.N.Y. July 22, 2008) ("An order of preclusion, however, would only prohibit defendants from introducing [expert's untimely] opinion . . . ; it would not otherwise preclude [expert] from testifying for defendants regarding his original opinions"). Therefore, the second factor favors preclusion.

Third, the Court cannot say that the Government would not be prejudiced by having to respond to the Mallory Letter. The Mallory Letter contains new testimony and was submitted after the Government fully briefed its motion for summary judgment. *See*, *e.g.*, *Fleming v. Verizon N.Y., Inc.*, No. 03-cv-5639, 2006 WL 2709766, *8 (S.D.N.Y. Sept. 22, 2006) ("[Defendant] would be prejudiced by the admission of the [expert] declarations, because it made its motion for summary judgment based on what it thought to be all of the evidence accumulated during discovery."). Moreover, the Government represents that the admission of the Mallory Letter into the record would prompt it to "file yet another motion for summary judgment[.]" Dkt # 49-1 at 12-13 n.2). This factor, then, favors preclusion.

Finally, although no trial date has been set, the Court finds that a continuation of discovery is not warranted because the contents of the Mallory Letter "clearly should have been included" in the Expert Report, and Foley has offered no explanation for this omission. *See Lidle*, 2009 WL 4907201 at *7. Accordingly, the Court concludes that even if the Mallory Letter was admissible, striking it would be appropriate pursuant to Rule 37(c)(1).

## CONCLUSION

For all of the above-stated reasons, the Government's motion for summary judgment (Dkt. # 37), is **GRANTED**. In addition, Foley's cross-motion to amend her Amended Complaint (Dkt. # 39), is **DENIED**. Finally, the Government's motion to strike supplemental expert

disclosure (Dkt # 49), is **GRANTED**.  Foley's Amended Complaint, therefore, is **DISMISSED with prejudice**.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
March 22, 2018.